**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **JOHN L. BYARS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 12-121** |
| | : | |
| **THE SCHOOL DISTRICT OF PHILADELPHIA,** | : | |
| **ET AL.,** | : | |
| **Defendants.** | : | |

_____ :

**Goldberg, J.**                                                                    **April 30, 2013**

## MEMORANDUM OPINION

Plaintiff, John Byars, has brought suit against Defendants, the School District of Philadelphia ("School District"), the School Reform Commission ("SRC") and numerous School District employees,[1] alleging various causes of action arising from events and ensuing publicity surrounding the School District's award of a $7.5 million contract for the installation of security cameras. Plaintiff's seventeen-count complaint asserts: defamation (Counts I, III, V, VII, IX); invasion of privacy/false light (Counts II, IV, VI, VIII, X), intentional infliction of emotional distress (Count XI); intentional interference with contractual relations (Count XII); retaliation in violation of the First Amendment, brought pursuant to 42 U.S.C. § 1983 (Count XIII); denial of due process rights under the Fifth and Fourteenth Amendments, brought pursuant to § 1983 (Counts XIV, XV); civil conspiracy (Count XVI); and aiding and abetting (Count XVII).

---

[1] These employees include: Arlene Ackerman, Leroy D. Nunery, II, Estelle Matthews, Jamilah Fraser, Shana Kemp (collectively, "individual School District Defendants"), Robert Archie, Jr., Denise McGregor-Armbrister, Joseph Dworetzky and Johnny Irizarry (collectively, "individual SRC Defendants").

Presently before the Court is Defendants' Motion to Dismiss. For reasons detailed below, Defendants' motion will be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Based upon the averments in the complaint, the pertinent facts, viewed in the light most favorable to Plaintiff, are as follows:

Plaintiff John Byars was the Executive Director of Procurement Services for Defendant, the School District of Philadelphia. His responsibilities included, among other things, administration of the School District's solicitation process for the acquisition of goods and professional services. (Compl. ¶¶ 13-14.)

On September 23, 2010, Defendant Arlene Ackerman, then-School District Superintendent,[2] directed Plaintiff to revoke a $7.5 million project for security camera installation preliminarily awarded to Security and Data Technologies and ordered that the award be given to IBS Communications ("IBS"). In accordance with Ackerman's instruction, Plaintiff prepared a resolution awarding the project to IBS for presentation to the School Reform Commission. The resolution was approved by the SRC on October 20, 2010. (Compl. ¶¶ 17-19, 23-24.)

On or about November 15, 2010, the Philadelphia Inquirer ("Inquirer") began an investigation into the award of the camera surveillance project to IBS. That same day, Ackerman and her staff held a meeting to discuss the investigation. Participants in this meeting included: then-Deputy Superintendent Leroy Nunery, II, Chief Communications Officer Jamilah Fraser and Deputy Chief Communications Officer Shana Kemp. Plaintiff alleges that, at this

---

[2] We note that Ackerman is now deceased. The parties have not indicated what effect, if any, Ackerman's death has on the motion before us. Therefore, we need not address that issue at this time.

meeting, the participants devised a scheme to make him the "scapegoat for any improprieties associated with the IBS contract." Plaintiff asserts that this scheme emanated from the participants' concern that he may have cooperated with, or would in the future cooperate with, the Inquirer investigation. (Compl. ¶¶ 28, 30-31.)

On the following day, Nunery met with Plaintiff to criticize his work performance and inform Plaintiff that he would be suspended without pay for three days during the upcoming Thanksgiving and Christmas holidays. A letter documenting the suspension was entered in Plaintiff's personnel file on November 22, 2010. However, despite Nunery's statement, no suspension was implemented in November or December 2010. Plaintiff claims that this was his first poor performance review in his eight years of employment with the School District. (Compl. ¶¶ 33-34, 36.)

On November 28, 2010, the Inquirer published an article entitled "Ackerman Steered Work, Sources Say," which was critical of the contract awarded to IBS. The article quoted Kemp as stating that Ackerman had nothing to do with the decision, but rather the "procurement officer approved it." The School District issued a press release the next day, wherein Nunery defended the IBS contract. However, Plaintiff claims that Nunery "did nothing to dispel the previously-published false statements that [Plaintiff] was responsible for selecting IBS." (Compl. ¶¶ 37-41, 43, 45-46, Ex. B, at 1, Ex. C.)

On December 2, 2010, the Inquirer published an article entitled "Ackerman Acknowledges Directing Surveillance Work to Minority Firm IBS." This article stated that Ackerman "acknowledged that she personally directed her staff" to ensure that IBS got a share of the surveillance camera contract. Further, the article quoted Nunery as stating that he "made the decision" to award the contract to IBS. When asked whether the decision was made by the chief

procurement officer, Nunery replied, "No." The article mentioned that Kemp had formerly stated that Plaintiff approved the decision. (Compl. ¶¶ 47-48, Ex. D.)

On or about December 13, 2010, Plaintiff was informed that he would be suspended with pay so that an investigation into the IBS contract and subsequent disclosure of confidential information could be undertaken. Plaintiff was subsequently escorted out of the School District building in the presence of others. On January 7, 2011, the Inquirer published an article entitled "Memo Warns Philly School District Staff of Penalties for Leaks." The article named Plaintiff as one of six employees suspended during the investigation. On January 25, 2011, the Inquirer published a subsequent article entitled "Four Suspended Philadelphia School District Administrators are Back on the Job." The article reported that Plaintiff was one of two employees still under suspension. (Compl. ¶¶ 50-52, 55, 57, Ex. F.)

On January 30, 2011, the Inquirer ran an article entitled "Accused of Rigging, District to Redo Bids." This article stated that Plaintiff was accused of interfering with the competitive bidding process by seeking to steer a previously awarded contract from the Elliott-Lewis Corporation to the minority owned U.S. Facilities, Inc. The article used several quotes from a School District source supporting the accusation. Plaintiff disputes the facts reported in the article and alleges that the School District source knew of the falsity of these facts. (Compl. ¶¶ 59-61, 63, Ex. G.)

While on suspension, Plaintiff was contacted by the FBI as part of a government investigation into the IBS contract. Plaintiff subsequently advised Defendant Estelle Matthews, Chief Talent and Development Officer for the School District, and the District's general counsel, Michael Davis, of the FBI's request to conduct an interview. Sometime in January 2011, the special counsel hired by the School District to conduct an internal investigation requested that

4

Plaintiff meet with him prior to his FBI interview. During the course of these discussions, which included Davis, Plaintiff asked that the School District provide him with private representation during his meeting with the FBI. This request was denied. (Compl. ¶¶ 64-67.)

On February 11, 2011, Plaintiff was interviewed by the FBI. On or about February 15, 2011, Plaintiff informed Davis of his meeting with the FBI. Two days later, Plaintiff received notice of a human resources conference to discuss his "improper work performance." On February 24, 2011, Plaintiff was again interviewed by the FBI. The next day, Plaintiff was informed that the three-day suspension ordered on November 22, 2010 would now be imposed in March and April 2011. (Compl. ¶¶ 68-72.)

On March 4, 2011, the School District issued a press release summarizing the findings of the internal investigation conducted by its special counsel. The press release stated that counsel had "found that Procurement Office staff decided to use IBS as the prime contractor." The press release further stated that special counsel concluded that the Procurement Office improperly delegated the role of managing the project and failed to have IBS prepare a cost estimate. (Compl. ¶¶ 75-77; Ex. H.)

On March 24, 2011, Plaintiff received a letter written by Defendant Matthews, advising that the School District was recommending his immediate termination to the SRC. The letter referenced the Elliott-Lewis incident and the three-day suspension as grounds for termination. The letter also stated that Plaintiff created and operated a website that violated the School District's Code of Ethics, despite the School District expressing approval in the past. The SRC approved the recommendation subject to Plaintiff's statutory right to challenge his termination. (Compl. ¶¶ 79-83.)

Plaintiff requested administrative review, and a multi-day hearing was later held over the course of several months. On November 15, 2012, the SRC adopted the findings and conclusions of the hearing officer, who determined that Plaintiff's termination was proper. Plaintiff appealed the decision to the Philadelphia County Court of Common Pleas, where the matter is still pending. (Compl. ¶ 83; Pl.'s Supp. Br. 1-2.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for failure to state a claim upon which relief can be granted. When ruling on a Rule 12(b)(6) motion, the court must accept the facts pled in the complaint as true and construe them in the light most favorable to the plaintiff. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000). The court may dismiss a complaint or claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). However, a plaintiff must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The complaint's "factual allegations must be enough to raise a right to relief above the speculative level." Id. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded

6

factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## III.  DISCUSSION[3]

### A.  Immunity – Political Subdivision Tort Claims Act

Defendants first argue that, pursuant to Pennsylvania's Political Subdivision Tort Claims Act ("PPSTCA"), the School District, the SRC and the individual SRC Defendants[4] are immune from liability with respect to Plaintiff's state tort claims.  (Defs.' Br. 30; Defs.' Reply Br. 10.) We agree.

Under the PPSTCA, local agencies, such as school districts and school reform commissions, are immune from liability "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541.  While there are exceptions from the immunity granted under § 8541, none apply here.  See 42 Pa. C.S. § 8542.[5]

---

[3] At the outset, we note that Plaintiff has indicated that he does not intend to pursue his claims for intentional infliction of emotional distress and civil conspiracy.  (Pl.'s Br. 2 n.1.)  Thus, we will grant Defendants' motion with respect to Counts XI and XVI.

[4] While Defendants did not raise the immunity defense with respect to the SRC members until their reply brief, Plaintiff was granted leave to file a sur-reply brief and thus had a fair opportunity to address this claim (Plaintiff also addressed this issue in his opening brief). Accordingly, we will evaluate the merits of Defendants' argument.

[5] Liability can be imposed for: (1) the operation of a motor vehicle in the possession or control of a local agency; (2) the care, custody or control of personal property in the possession or control of a local agency; (3) the care, custody or control of real property; (4) a dangerous condition created by trees, traffic controls or street lights; (5) a dangerous condition of utility service facilities; (6) a dangerous condition of streets; (7) a dangerous condition of sidewalks; and (8) the care, custody or control of animals in the possession or control of a local agency.  42 Pa. C.S. § 8542(b).

Municipal employees and officials "are generally immune from liability to the same extent as their employing agency, so long as the act committed was within the scope of the employee's employment." Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (citing 42 Pa. C.S. § 8545). However, the employee's immunity does not extend to acts that constitute "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. C.S. § 8550.

Here, Plaintiff attempts to hold the individual SRC Defendants vicariously liable for the alleged misconduct of the individual School District Defendants. Plaintiff does not plead that any of the SRC members committed a crime or actual fraud, or that they acted with malice or engaged in willful misconduct. Indeed, the only factual allegation regarding these Defendants relates solely to the SRC's approval of the School District's recommendation to terminate Plaintiff, which was clearly within the scope of the SRC members' employment. (Compl. ¶ 83.) Thus, we find that Plaintiff's state law claims against Defendants Archie, McGregor-Armbrister, Dworetzky and Irizarry are barred by the PPSTCA.

Accordingly, Counts I-XII and XVI-XVII with respect to the School District, SRC, Archie, McGregor-Armbrister, Dworetzy and Irizarry are dismissed.

## B.     Defamation (Counts I, III, V, VII, and IX)

Defendants next argue that Plaintiff has failed to state a plausible claim for defamation. Specifically, Defendants contend that Plaintiff's defamation claims against the School District officials fail as a matter of law because those individuals maintain high public official immunity, and, in any event, Plaintiff has not pled the requisite elements to state such a claim. We address each argument in turn.

### 1.     High Public Official Immunity Doctrine

Pennsylvania "exempts a high public official from all civil suits for damages arising out

8

of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers." Smith v. Borough of Dunmore, 633 F.3d 176, 181 (3d Cir. 2011) (quoting Lindner v. Mollan, 677 A.2d 1194, 1195 (Pa. 1996)) (internal quotation marks omitted). The determination of whether a particular public officer is protected by absolute privilege depends on the nature of his duties, the importance of his office and whether or not he has policy-making functions. Lindner, 677 A.2d at 1198. Pennsylvania courts have recognized that school superintendents qualify as high public officials for purposes of this doctrine. Smith v. Sch. Dist. of Phila., 112 F. Supp. 2d 417, 425 (E.D. Pa. 2000).

In their motion, Defendants argue that high-ranking officials in the School District, including the individual School District Defendants in this case, are responsible for setting policy for Philadelphia's public education system and are therefore absolutely immune from liability for defamatory statements or actions taken in the course of their official duties. Defendants further contend that the conduct alleged in the complaint was indisputably taken in the individual School District Defendants' official capacities. (Defs.' Br. 7.)

Plaintiffs respond that there are issues of fact that need to be developed before the Court can determine whether the School District employees classify as high public officials. Moreover, Plaintiff notes that Defendants have failed to cite to any authority to support their claim that the non-superintendent positions at issue—namely, a deputy superintendent, chief talent and development officer, chief communications officer and/or a deputy chief communications officer—could be considered high public official positions. (Pl.'s Br. 8-9.)

We note that the allegations raised in Plaintiff's defamation counts are limited to statements made and conduct taken in connection with School District business. Thus, if each

9

individual School District Defendant constitutes a high public official, then Plaintiff's defamation claims will fail. However, at this early stage of the litigation, we are only prepared to make such a determination with regard to former-Superintendent Ackerman. See Smith, 112 F. Supp. 2d at 425. Although it is possible that the other individuals will classify as high public officials, it is not clear from the complaint or briefing what duties these individuals had or whether they were given policy-making authority. Accordingly, we find it premature to dismiss Plaintiff's defamation claims against Nunery, Matthews, Fraser and Kemp on this basis.

### 2. Sufficiency of the Pleadings

To state a claim for defamation, a plaintiff must show: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. C.S. § 8343(a); see also Balletta v. Spadoni, 47 A.3d 183, 196-97 (Pa. Commw. Ct. 2012). Defendants argue that Plaintiff's defamation claims fail to plead the existence of these elements.

### i. Count I – The November 2010 Statements

In Count I, Plaintiff alleges that Kemp's statements that Ackerman had nothing to do with the decision to award the contract to IBS and that the "procurement officer approved it" are defamatory. Defendants challenge this claim on the grounds that the statements were not defamatory in nature and were not intended to apply to Plaintiff.

A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Tucker v. Phila. Daily News, 848 A.2d 113, 124 (Pa. 2004). Whether a statement is

10

capable of a defamatory meaning is a question of law for the court.  Blackwell v. Eskin, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007) (citing Tucker, 848 A.2d at 123).  To decide this question, the court must look at the language of the communication, its implications and the context in which it was made, and determine how a reasonable person would interpret the statement. Tucker, 848 A.2d at 124; Davis v. Resources for Human Dev., Inc., 770 A.2d 353, 357 (Pa. Super. Ct. 2001).  If upon review of the challenged publication the court determines that there is both an innocent and alternate defamatory interpretation, the issue must proceed to the jury. Dougherty v. Boyertown Times, 547 A.2d 778, 783 (Pa. Super. Ct. 1988).

A plaintiff must also show that the communication applies to him and was understood by a third party as applying to him.  "A party defamed need not be specifically named, if pointed to by description or circumstances tending to identify him."  Cosgrove Studio & Camera Shop, Inc. v. Pane, 182 A.2d 751, 753 (Pa. 1962).  The test is "whether the defamatory communication may reasonably be understood as referring to the plaintiff."  Zerpol Corp. v. DMP Corp., 561 F. Supp. 404, 410 (E.D. Pa. 1983) (citing Farrell v. Triangle Publ'ns, Inc., 159 A.2d 734 (Pa. 1960)).

Given that the decision to award the camera surveillance contract to IBS was the subject of public criticism, we find that Kemp's statements are capable of defamatory meaning. Specifically, considering the context in which the statement was made—wherein the media questioned whether the award of the contract was proper and noted that a previous award to IBS wasted public funds—a reasonable person could interpret the statements as implying that the decision maker acted in a way that was inconsistent with the proper and honest performance of his job.  The fact that Kemp defended the award and stated that "there [we]re no improprieties" does not change our analysis.  In addition, because Plaintiff was the Executive Director of Procurement Services and Kemp's statement referred to the "procurement officer", Plaintiff has

plausibly pled that the communication applies to him.  Thus, with the exception of Ackerman, Defendants' motion will be denied on Count I.

### ii.    Count III – Plaintiff's Suspension

In Count III, Plaintiff asserts that Defendants' act of suspending him and escorting him out of the School District's administrative building brought him unwarranted humiliation and contempt, and constitutes defamation.  Defendants argue that this claim fails because the suspension was neither defamatory nor published.

Under Pennsylvania law, words, gestures or a combination of both may constitute a defamatory communication.  Bennett v. Norban, 151 A.2d 476, 478 (Pa. 1959).  Further, a defendant is responsible for publishing a defamatory communication where he either personally published the communication, or directed or participated in the publication of a defamatory communication by another.  Ertel v. Patriot-News Co., 674 A.2d 1038, 1043 (Pa. 1996). Publication requires "communication intentionally or by a negligent act to one other than the person defamed."  Gaetano v. Sharon Herald Co., 231 A.2d 753, 755 (Pa. 1967) (quoting RESTATEMENT (THIRD) OF TORTS § 577 (1938)).

In light of Plaintiff's allegations that, after being informed of his suspension, he was escorted to his office and then out of the administrative building in the presence of others, we find that he has sufficiently alleged a defamatory communication as well as publication to another.  The physical conduct of being escorted could certainly imply that Plaintiff acted improperly, and thus could reflect negatively on his integrity.  In addition, Plaintiff stated that others were present as he was escorted out of the building, which is sufficient to state that the conduct was communicated to others.  Accordingly, Plaintiff has plausibly stated a claim of defamation with respect to Count III.

### iii.  Count V – Elliot-Lewis Contract

In Count V, Plaintiff alleges that unknown employees of the School District falsely accused him of improperly interfering with the award of a contract to Elliot-Lewis Corporation. Because the defendants against whom this claim is raised are entitled to immunity, see Part III.A, supra, we will grant Defendants' motion to dismiss with respect to Count V.[6]

### iv.  Count VII – March 4, 2011 Press Release

In Count VII, Plaintiff asserts that the School District's March 4, 2011 press release, which summarized the findings of the special counsel's internal investigation, was defamatory in that it stated that counsel had concluded, among other things, that: (1) Procurement Office staff decided to use IBS as the prime contractor; (2) Procurement Office staff improperly delegated the role of managing the project to the Office of School Safety; and (3) Procurement Office staff failed to obtain a proper cost estimate.  Defendants challenge this claim, arguing that the communication was neither defamatory nor applicable to Plaintiff.

We disagree and find that Plaintiff has sufficiently stated a claim of defamation.  As previously discussed, because Plaintiff was the Executive Director of Procurement Services, he has plausibly pled that communications concerning "Procurement Office staff" apply to him. Given the public criticism surrounding the award of the contract, and considering that the press release publicized specific findings that Procurement Office staff did not properly perform the duties of the job, we conclude that the release is capable of defamatory meaning.

### v.  Count IX – Plaintiff's Termination

In Count IX, Plaintiff alleges that the necessity of having to repeat the circumstances of

---

[6] Nevertheless, we will give Plaintiff leave to amend his complaint to assert this claim against an alternative Defendant.  Plaintiff shall have twenty-one (21) days from the date of this Order to file his amended complaint.

his termination to potential employers constitutes defamation. Defendants challenge the sufficiency of this claim, arguing that Plaintiff has not alleged how Defendants publicized any employment action taken against him. Plaintiff counters that the publication element is satisfied based on the doctrine of compelled self-publication.

Under the doctrine of compelled self-publication, the publication element is satisfied "where the defendant makes the defamatory statement to the plaintiff who later is compelled to communicate the defamatory matter to a third party, and it was foreseeable to the defendant that the plaintiff would be compelled to publish the matter." Yetter v. Ward Trucking Corp., 585 A.2d 1022, 1024 (Pa. Super. Ct. 1991). While the Pennsylvania Superior Court expressly declined to adopt such a rule in Yetter v. Ward Trucking Corporation, Plaintiff urges that the narrow holding of that case does not apply to the instant matter.

In Yetter, a terminated employee asserted that he had demonstrated publication in that he was compelled to disclose to his family, relatives and prospective employers the allegedly defamatory statements contained in his termination letter. Id. at 1024. Noting that Pennsylvania recognizes the absolute privilege of employers to publish defamatory matter in notices of employee termination, the court held that "where the defamation action rests on the publication of an employee termination letter by the employer to the employee only, the requirement that the defamatory matter be published by the defendant is not met through proof of compelled self-publication." Id. at 1025. The court also stated that it expressed "no view as to whether under a different set of circumstances, compelled self-publication of the defamatory material by the defamed person, rather than by the defendant, to a third party will suffice." Id.

Plaintiff contends that the doctrine of compelled self-publication should be applied in this case because his claims are not based solely on the defamatory statements in his termination, but

14

also on the media accounts of his employment relationship with the School District. Plaintiff argues that he is compelled to repeat the statements contained in the letter as well as everything preceding his termination as documented by the media. (Pl.'s Br. 16-17.)

After careful consideration, we find that the crux of Plaintiff's claim—that he was compelled to disclose the contents of his termination letter—involves the same circumstances confronted in Yetter. While Plaintiff attempts to distinguish this case by arguing that he was also compelled to communicate prior statements made by Defendants and published by third-party media outlets, he maintains separate causes of action with regard to such conduct. As such, we will not vitiate the established privilege of Pennsylvania employers to publish alleged defamatory statements to their employees by adopting Plaintiff's proposed theory of publication. Because Plaintiff has not alleged that Defendants published his termination letter to a third party, Count IX will be dismissed.

### C. Invasion of Privacy/False Light (Counts II, IV, VI, VIII, and X)

A cause of action for invasion of privacy is "actually comprised of four analytically distinct torts: 1) intrusion upon seclusion, 2) appropriation of name or likeness, 3) publicity given to private life, and 4) publicity placing a person in false light." Krajewski v. Gusoff, 53 A.3d 793, 805 (Pa. Super. Ct. 2012). The last of these, recognized in Pennsylvania as false light invasion of privacy, is defined by the Restatement (Second) of Torts,[7] section 652E as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless

---

[7] Pennsylvania courts have adopted the Restatement definition of false light invasion of privacy. E.g., Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988).

> disregard as to the falsity of the publicized matter and the false
> light in which the other would be placed."

Id. at 805-06 (citing RESTATEMENT (SECOND) OF TORTS § 652E).  Unlike invasion of privacy

for publicity given to private life, "false light does not require proof that the matter giving rise to

the plaintiff's claim be restricted to one of private concern."  Id. at 806.[8]

Plaintiff's invasion of privacy/false light claims are based on the same five incidents that

Plaintiff has asserted in his defamation counts.  Defendants argue that four of the five false light

counts (Counts II, IV, VI, and X) should be dismissed for failure to plead publicity.[9]

Publicity is defined as making the matter public "by communicating it to the public at

large, or to so many persons that the matter must be regarded as substantially certain to become

one of public knowledge."  RESTATEMENT (SECOND) OF TORTS § 652D cmt. a; id. at § 652E

(referring to § 652D for a definition of publicity); see also Harris by Harris v. Easton Publ'g Co.,

483 A.2d 1377, 1384 (Pa. Super. Ct. 1984).  Publicity is not the same as "publication," as it is

used in the defamation context, which is defined as any communication to a third party.  See

Harris, 483 A.2d at 1384.  Rather, publicity must be such that the communication "reaches, or is

sure to reach, the public."  Id.  Thus, it is not an invasion of the right of privacy "to communicate

---

[8] We note that, during oral argument, Defendants agreed that the proper elements of an invasion of privacy/false light claim are set forth in Krajewski v. Gusoff, 53 A.3d 793, 805 (Pa. Super. Ct. 2012).  As such, we need not address Defendants' arguments regarding elements of other invasion of privacy claims.

[9] With respect to Count VIII, Defendants only argue that Plaintiff has failed to state that the facts at issue were not of public concern.  However, because Defendants have conceded that this is not an element of Plaintiff's claim, we will deny Defendants' motion with respect to Count VIII.

We also note that Defendants raise for the first time in their reply brief that the statements at issue cannot be construed to be highly offensive to a reasonable person.  However, we find that Plaintiff's complaint has sufficiently alleged this element with respect to her viable claims, and will not dismiss Plaintiff's invasion of privacy/false light counts on this basis.

a fact concerning the plaintiff's private life to a single person or even to a small group of persons." RESTATEMENT (SECOND) OF TORTS § 652D cmt. a. On the other hand, publication in a newspaper or a statement made in an address to a large audience is sufficient to give publicity. Id.

### 1. Count II – November 2010 Statements

Regarding Count II, Defendants argue that Plaintiff has failed to state a claim because the complaint demonstrates that it was the Philadelphia Inquirer, and not Defendants, who gave publicity to Plaintiff's involvement in the security camera contract award. We disagree.

We find that Plaintiff has plausibly stated the publicity element in that he alleged that Defendant Kemp made the statements to the newspaper, and that Defendants Ackerman, Nunery and Fraser directed or in some way participated in this communication. (See Compl. ¶¶ 40-42.) Although Kemp may have only spoken with one individual at the Inquirer, given the nature of the issues surrounding the award to IBS, we find that Plaintiff has adequately pled that Kemp's communication was "substantially certain to become one of public knowledge."

### 2. Count IV – Plaintiff's Suspension

With respect to Count IV, Defendants assert, once again, that the Inquirer, not Defendants, publicized that Plaintiff was placed on suspension.

In his complaint, Plaintiff states that he was suspended and then escorted out of the building "in the presence of others." He further alleges that the Inquirer published three articles regarding the School District's suspension of employees who were thought to have disclosed to the public details about School District contracts. Plaintiff asserts that the second article identified him as one of the suspended employees, and the third article identified him as

remaining under suspension. Plaintiff argues that Defendants knew or should have known that such information would be leaked and published in the media. (See Pl.'s Compl. ¶¶ 50-58.)

We conclude that Plaintiff has not adequately stated the publicity element of his claim. While Plaintiff has alleged that he was escorted out of the building "in the presence of others," he has not plausibly pled that the number of individuals was so large as to constitute publicity. Further, Plaintiff's argument that Defendants "knew or should have known that such information would be leaked and published in the media" is insufficient to carry his burden. Plaintiff has not alleged that Ackerman, Nunery or Matthews communicated the suspension to the Inquirer or to a large audience. Nor can it reasonably be inferred from the complaint that these individuals participated in any such communication. Thus, Count IV will be dismissed.

### 3. Count VI – Elliot-Lewis Contract

Defendants also contend that Count VI should be dismissed because it was Elliot-Lewis who publically accused Plaintiff of wrongdoing. However, because Plaintiff has alleged that a School District source communicated false accusations regarding Plaintiff's conduct to the Inquirer in furtherance of a scheme involving Defendant Ackerman, Plaintiff has plausibly stated that Ackerman in some way participated in the communications and that the communications were sure to reach the public. (See Compl. ¶ 63.)

### 4. Count X – Plaintiff's Termination

Lastly, with regard to Count X, Defendants argue that Plaintiff has failed to identify any way in which Defendants communicated Plaintiff's termination to others. We agree, and will therefore dismiss Count X.

**D.    Intentional Interference with Contractual Relations (Count XII)**

In Count XII, Plaintiff asserts that Defendants intentionally interfered with his prospective contractual relations with the Queens Library System in New York.  Specifically, Plaintiff alleges that he was offered a position with the Queens Library System subject to a reference check.  He asserts that his offer was subsequently rescinded even though his references were never contacted.  Plaintiff further asserts that "[i]t is believed, and therefore averred, that the School District gave [Plaintiff] a negative reference and/or that the Library System learned of the IBS debacle and the other negative press and withdrew its offer."  (Pl.'s Compl. ¶¶ 160-61.)

To state a claim for intentional interference with contractual relations, a plaintiff must show: (1) the existence of a contractual or prospective contractual relation between the plaintiff and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.  Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (Pa. Super. Ct. 2003).  Defendants challenge only the second element of this claim, arguing that Plaintiff's complaint is speculative regarding what actions, if any, Defendants took regarding Plaintiff's prospective employment contract.

On this issue, we agree with Defendants and conclude that Plaintiff has not plausibly stated that Defendants took any actions to interfere with his prospective employment opportunity.  Although Plaintiff argues that Defendants engaged in an orchestrated effort to discredit Plaintiff and tarnish his reputation, the factual allegations indicate that these actions would have occurred only prior and up to his termination, and not during the course of his interactions with the Queens Library System.  Thus, we will dismiss Count XII.

### E.   First Amendment - Retaliation (Count XIII)

#### 1.   Liability of the Individual Defendants

We first note that Plaintiff has conceded that his First Amendment retaliation claim fails to state a plausible claim against the School District and the SRC.  (See Pl.'s Br. 24.)  Therefore, we will dismiss Count XIII against those Defendants.

In their motion, Defendants argue that Plaintiff's First Amendment claim against the individual Defendants must also fail.  Defendants contend that Plaintiff has sued the individual Defendants only in their official capacities.  Accordingly, Defendants assert that Plaintiff's concession on municipality liability is fatal to his claim against the individual Defendants.  (Defs.' Br. 29; Defs.' Reply Br. 8-9.)

Plaintiff acknowledges that his claims against the individual Defendants cannot be predicated on a theory of respondeat superior, but contends that he has pled sufficient personal involvement of the individual Defendants to support liability under § 1983.  (Pl.'s 24-25.)

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Hafer v. Melo, 502 U.S. 21, 25 (1991) (internal quotation marks omitted).  Such suits should therefore be treated as suits against the governmental entity.  Id.  Where a plaintiff fails to establish liability against a municipal entity, municipal employees sued in their official capacities are similarly entitled to judgment in their favor.  See Smith v. Sch. Dist. of Phila., 112 F. Supp. 2d 417, 425 (E.D. Pa. 2000).

On the other hand, personal-capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law."  Hafer, 502 U.S. at 25.  When a plaintiff brings a § 1983 claim against a defendant in his or her individual capacity, the plaintiff must establish that the defendant had "personal involvement in the alleged wrongs; liability

cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be demonstrated through "allegations of personal direction or of actual knowledge and acquiescence." Id.

In his complaint, Plaintiff expressly alleges that his claims were brought against Defendants Archie, McGregor-Armbrister, Dworetzky and Irizarry in their official capacities as SRC Commissioners. (Compl. ¶¶ 6-9.) However, Plaintiff's complaint is silent as to what capacity he is suing Defendants Ackerman, Nunery and Matthews (collectively, "School District employee-Defendants"). (See Compl. ¶¶ 4-5, 10-12.) Viewing the allegations in a light most favorable to Plaintiff, as we must, we construe his complaint as asserting claims against the School District employee-Defendants in both their official and individual capacities.

With regard to the official-capacity claims, we agree with Defendants that Plaintiff's concession as to municipal liability bars his claims against the individual Defendants. Thus, we will dismiss Count XIII against Archie, McGregor-Armbrister, Dworetzy and Irizarry, as well as the School District employee-Defendants in their official capacities.

Nevertheless, because Defendants have not challenged whether Plaintiff's complaint has sufficiently alleged personal involvement by the School District employee-Defendants, such that they may be held liable in their personal capacities, Plaintiff's First Amendment claim remains viable against the School District-employee Defendants in their individual capacities.[10]

---

[10] In any event, we find that Plaintiff has sufficiently alleged personal involvement by Ackerman, Nunery and Matthews. (See Compl. ¶¶ 68-74, 79.) While the allegations pertain to conduct by Matthews, we find that it is reasonable to infer knowledge and acquiescence by Ackerman and Nunery given their respective positions.

## 2. Sufficiency of the Pleadings

In his First Amendment retaliation claim, Plaintiff asserts that he was terminated from his employment "in retaliation for the fact that [he] voluntarily spoke with the FBI regarding the circumstances surrounding the camera surveillance project." (Pl.'s Compl. ¶ 167.)

In order to plead a First Amendment retaliation claim, a plaintiff must demonstrate that his speech was protected, and that it was a motivating factor in the alleged retaliatory act. If the plaintiff meets this burden, a defendant may still defeat the claim by showing that, even in the absence of the protected speech, the adverse action at issue would have been taken. Walker v. City of Camden, 57 Fed. App'x 943, 945 (3d Cir. 2003) (citing Watters v. City of Phila., 55 F.3d 886, 892 (3d Cir. 1995)). A public employee's speech is entitled to First Amendment protection where: (1) the employee spoke as a citizen; (2) the statement implicated a matter of public concern; and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made. Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. This rule reflects a public employer's prerogative to control "what the employer itself has commissioned or created." Id. at 411. Further, the inquiry into whether particular speech is made pursuant to official duties is a "practical one." Id. at 422. "[A] claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (quoting Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007), overruled on other grounds by Borough of Duryea

v. Guarnieri, 131 S. Ct. 2488, 2491 (2011)).  We note that the Third Circuit has consistently held that "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties."  Morris v. Phila. Housing Auth., 487 Fed. Appx. 37, 39 (3d Cir. 2012).

Moreover, "[a]n employee's speech addresses a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community."  Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993).  In making this determination, courts must look to "the content, form, and context of a given statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147-48 (1983).

In their motion, Defendants first challenge whether Plaintiff spoke as a private citizen when he communicated with the FBI.  They argue that his speech took place within the scope of his official duties, and thus is not entitled to First Amendment protection.  In support, Defendants contend that Plaintiff's conversations with the FBI concerned matters learned exclusively through Plaintiff's workplace knowledge and experience.  (Defs.' Br. 21; Defs.' Reply Br. 6-7.)

Defendants further assert that Plaintiff had no interest in bringing the security camera project to the public's attention, but instead spoke with the FBI given his "highly personal interest in 'setting the record straight.'"  We understand this claim to challenge the public concern element of Plaintiff's claim.  Essentially, Defendants argue that Plaintiff's speech was so personally motivated that it is not entitled to First Amendment protection.   (Defs.' Br. 21-22.)

After careful consideration, we find that Plaintiff has plausibly stated a claim for First Amendment retaliation.  Viewing the facts in a light most favorable to Plaintiff, the allegations adequately plead that he was speaking as a private citizen, and not pursuant to his official duties,

when he communicated with the FBI. There is no indication from the complaint that Plaintiff had an official duty to participate in the FBI's investigation, or that Defendants commissioned Plaintiff's statements. Although Plaintiff's speech likely relates to special knowledge or experience acquired through his job, this is but one consideration in determining whether speech is within an employee's official duties. See Gorum, 561 F.3d at 185. Moreover, this is not a case in which the speech at issue was communicated internally up the chain of command, such that it would be appropriate to grant Defendants' motion to dismiss.

We also note that Plaintiff's complaint makes clear that his conversations with the FBI involved matters of public concern. Plaintiff has alleged that, during the course of his discussions with the FBI, he "denied that he selected IBS for the camera surveillance contract and was critical of the School District with regard to the circumstances surrounding the camera surveillance contract award." (Compl. ¶¶ 68, 71.) Plaintiff has also alleged that IBS was not an approved vendor, which was required for them to receive public funds. (Id. at ¶ 32.) Thus, while Plaintiff's discussion with the FBI may have been motivated, at least in part, by his own personal concern to clear himself of any wrongdoing, we do not find this fatal to his claim. See Dougherty v. Sch. Dist. of Phila., 2012 WL 6526946, at *6 (E.D. Pa. Dec. 14, 2012) (reaching the same conclusion in a case involving the same factual circumstances—that is, the award of the camera surveillance contract to IBS). Instead, we conclude that Plaintiff has adequately stated that his communications with the FBI implicated matters of public concern: the misuse of government funds.

In sum, we will grant in part and deny in part Defendants' motion with respect to Count XIII. Plaintiff's First Amendment retaliation claim will be dismissed against the School District, the SRC, Archie, McGregor-Armbrister, Dworetzky, and Irizarry. The claim will also be

dismissed against Ackerman, Nunery and Matthews in their official capacities.  However, Defendants' motion will be denied with respect to Plaintiff's claims against Ackerman, Nunery and Matthews in their personal capacities.

### F.    Due Process Claims (Count XIV-XV)

In Counts XIV and XV, Plaintiff claims that he was denied a liberty interest in his reputation and a property interest in his employment when he was terminated from his position with the School District.

To state a claim for a violation of procedural due process, a plaintiff must allege that: "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law."  Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ., 574 F.3d 214, 219 (3d Cir. 2009) (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (internal quotation marks omitted)).

Defendants argue, among other things, that Plaintiff's due process claims are premature in that Plaintiff has a pending appeal of the SRC's administrative decision in state court. Therefore, Defendants contend that the claims are not ripe for adjudication, and are, or will be, barred by the doctrine of claim preclusion/res judicata and the Rooker-Feldman doctrine.  (Defs.' Br. 24-25; Defs.' Supp. Br. 2-3.)

Plaintiff responds that, because Defendants' role in the termination process is completed, the due process claims are ripe to be heard.  Nevertheless, Plaintiff acknowledges that the state court proceeding may "ostensibly remedy the due process issues" in the instant matter, and thus Plaintiff does not object to a stay of these claims.  (Pl.'s Supp. Br. 3.)

In light of Plaintiff's administrative appeal, we agree with Defendants that Plaintiff's due process claims are not ripe for disposition. Nevertheless, rather than dismiss Counts XIV and XV without prejudice, we will stay the claims pending the outcome of the state court proceedings. See Puricelli v. Borough of Morrisville, 820 F. Supp. 908, 919 (E.D. Pa. 1993) (citing Linnen v. Armainis, 991 F.2d 1102, 1107 (3d Cir. 1993)) (noting the preference for "holding federal civil rights claim in abeyance until state appellate proceedings that may affect the outcome of the federal action are decided"). Thereafter, Defendants may raise any available arguments to challenge the claims.

### G. Aiding and Abetting (Count XVII)

Finally, Defendants argue that Plaintiff's claim for aiding and abetting must be dismissed. To state a claim for aiding and abetting or "concerted action," a plaintiff must show that the defendant: (1) committed a tortious act in concert with another or pursuant to a common design with another; or (2) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (3) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Burnside v. Abbott Laboratories, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (citing RESTATEMENT (SECOND) OF TORTS § 876). Parties are considered to be "acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result." RESTATEMENT (SECOND) OF TORTS § 876 cmt. a.

As discussed previously, we find that Plaintiff has adequately stated claims for defamation and invasion of privacy/false light against Ackerman, Nunery, Matthews, Fraser and Kemp. We also conclude that Plaintiff's complaint has sufficiently alleged that these Defendants

acted in concert with one another in committing the alleged tortious conduct.  (See Compl. ¶¶ 30-31, 193.)  Thus, we will not dismiss Count XVII against Ackerman, Nunery, Matthews, Fraser and Kemp.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss will be granted in part and denied in part.

An appropriate Order follows.