**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN L. BYARS,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 12-121** |
| | : | |
| **THE SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA, <u>et al.</u>,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                                                    **August 13, 2015**

<u>**MEMORANDUM OPINION**</u>

       Plaintiff, John L. Byars, has brought suit against the School District of Philadelphia ("School District"), the School Reform Commission ("SRC") and numerous School District employees, alleging various state and federal causes of action arising from the events and ensuing publicity surrounding the School District's award of a $7.5 million contract for the installation of security cameras.

       Before me is the motion for summary judgment filed by the Estate of Dr. Arlene Ackerman[1], Dr. Leroy Nunery, II, Estelle Matthews, Jamilah Fraser and Shana Kemp. For the reasons that follow, I will grant Defendants' motion in part and deny Defendants' motion in part.

**I.      <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

       The following facts are undisputed unless otherwise indicated:[2]

---

[1] Ackerman died on February 2, 2013. Her estate was substituted as a defendant on October 24, 2013.

[2] In response to portions of Defendants' statement of facts, Plaintiff responds that he is "without sufficient information" to admit or deny the veracity of certain assertions. (<u>See</u> Pl.'s Ans. to

On April 21, 2003, Plaintiff was hired by the School District as a Procurement Services Assistant. (Pl.'s Mem. Ex. D.) In 2008, Plaintiff was promoted to Executive Director of the Office of Procurement Services, where he remained until his termination on March 24, 2011. As Executive Director, Plaintiff's responsibilities included administration of the School District's competitive solicitation process, administration of the Small Business Development Program and ensuring compliance with minority participation contracting requirements as set out in the School District's Anti-Discrimination Policy. (Defs.' Mot. Ex. A, Byars Dep. Vol. I 16:12-17, 20:5-22; 23:16-24:10, Defs.' Mot. Ex. CC.)

In early 2010, Plaintiff informed Ed Solomon, Assistant General Counsel for the School District, that he intended to launch a website in his personal capacity that could involve solicitation of Philadelphia businesses. According to Plaintiff, he discussed the website with Solomon in his official capacity and that Solomon never indicated that there was anything improper about the operation of the website. (Defs.' Mot. Ex. B, Byars Dep. Vol. II 124:5-130:8.) However, Solomon testified that he discussed the website with Plaintiff as a friend, and not in his capacity as counsel for the School District. (Defs.' Rep. Ex. 2, 336:8-337:9.)

At the time of his termination, Plaintiff reported to Defendant Dr. Leroy Nunery, II, Deputy Superintendent for the School District. (Byars Dep. Vol. I 54:11-18.) Nunery served as a member of Defendant Superintendent Arlene Ackerman's executive team. Nunery's responsibilities included managing the day to day operations of the School District and, in Ackerman's absence, serving as the acting Superintendent. Nunery reported to Ackerman who in

---

Defs.' Statement of Fact ¶¶ 21-22, 57, 65, 70, 72-74, 102, 108-112, 118, 128-130, 132-134, 141 and 145.) Such statements are insufficient to create a genuine issue of material fact. Therefore, I will treat those facts as undisputed.

turn reported directly to the SRC, an entity responsible for approving all School District contracts. (Defs.' Mot. Ex. AA ¶¶ 8-3.)

In order to reduce violence in certain schools, the School District planned to install security cameras in nineteen schools. The camera project was initiated in response to a Safe Schools audit between the Pennsylvania Department of Education and the School District that found the nineteen schools to be "persistently dangerous." (Defs.' Mot. Ex. N.) On September 23, 2010, Ackerman convened a meeting with Plaintiff, Nunery, Deputy Chief of Operations Francis X. Dougherty[3] and Senior Vice President of Facilities and Operations Jeff Cardwell to discuss the camera installation project. (Byars Dep. Vol. I 82:7-83:17.)

During this meeting, the participants discussed a proposed SRC resolution prepared by Deputy Chief Information Officer Bob Westwall to award a $7.5 million dollar contract to Security and Data Technologies (SDT), a non-minority owned company, to install the cameras. The proposed resolution was a formal document that requested the SRC's approval of the contract. In response to the proposed resolution, Ackerman stated that SDT had overcharged the School District in connection with a previous project. (Byars Dep. Vol. I. 85:18-24, 88:22-92:12.)

At the conclusion of the meeting, a decision was made to award the contract to IBS Communications, Inc. ("IBS"), a minority owned company. The parties vigorously dispute who made this decision. Plaintiff contends that Ackerman ordered him to prepare a proposed SRC resolution to award the contract to IBS. (Id. at 92:15-93:14; Byars Dep. Vol. II 5:24-6:11.)

---

[3] Dougherty is a defendant in the case before me. He is currently pro se and did not file a motion for summary judgment. Dougherty was also a plaintiff in a separate but related case against the School District before the Honorable Juan R. Sanchez. See Dougherty v. Sch. Dist. of Philadelphia, 2013 WL 5525642, at *1 (E.D. Pa. Oct. 4, 2013). This case is discussed infra.

Defendants, on the other hand, contend that Plaintiff volunteered to prepare a proposed SRC resolution to award the contract to IBS. (Defs.' Mot. Ex. Y, Ex. 1.) As detailed infra, the dispute regarding who made this decision is central to this case.

Defendants Jamilah Fraser, Chief Communications Officer, and Shana Kemp, Deputy Chief Communications Officer, were not present at the September 23, 2010 meeting. Fraser began working at the School District on November 8, 2010. Kemp started working at the School District at some point after September 23, 2010. (Pl.'s Mem. Ex. Z, Shana Kemp Dep. 6:7-10, 27:19-24; Defs.' Mot. Ex. D, Jamilah Fraser Dep. 9:8-17.)

On October 20, 2010, the SRC approved the resolution prepared by Plaintiff to award the contract to IBS. Shortly thereafter, Nunery assigned Plaintiff to oversee the camera installation project. (Byars Dep. Vol. I 124:8-14.)

On November 16, 2010, Nunery met with Plaintiff to discuss his work performance. Nunery requested that Plaintiff create a Performance Improvement Plan ("PIP") in response to certain deficiencies outlined by Nunery. Plaintiff drafted a PIP dated November 19, 2010 wherein he agreed to meet the following requirements: (1) provide responses to SRC requests for information within two business days or within a timeframe acceptable to the executive leadership and the SRC; (2) complete hiring for two vacant buyer positions; (3) reconfigure procurement work teams to increase efficiency and review the performance of each individual in the Office of Procurement; (4) develop an action plan for textbook ordering and inventory controls; and (5) implement recommendations from the SRC. (Pl.'s Mem. Ex. L; Defs.' Mot. Ex. O.)

In a letter dated November 22, 2010, Nunery informed Plaintiff that he would be suspended for three days without pay because Plaintiff's "overall performance [was] not fully meeting expectations." (Pl.'s Mem. Ex. L.)

On November 28, 2010, the Philadelphia Inquirer published an article entitled "Ackerman Steered Work, Sources Say." This article states that: 1) Ackerman overruled the recommendation of her staff to award the camera installation project contract to SDT and ordered that it be given to IBS instead; 2) Ackerman had steered work to IBS on a prior occasion; 3) on that earlier occasion the School District paid twelve times more than the offering price of another contractor; and 4) IBS was not on the list of approved contractors eligible for emergency work. According to the article, Kemp "repeatedly denied that Ackerman played any role in selecting IBS for the work" and stated that "[r]ather than Ackerman, our procurement officer approved it." (Pl.'s Mem. Ex. M.)

The following morning Ackerman summoned Plaintiff to discuss the article. According to Plaintiff, during this meeting Ackerman asked Plaintiff "[h]ow did it come to pass that you selected IBS to get this contract?" (Byars Dep. Vol. II 20:4-24.)

Later that same day, Nunery issued a press release entitled "Deputy Superintendent's Response to Sunday's Inquirer Article." The press release states "we made the executive decision to do a sole source contract for professional services as opposed to conducting a request for proposal process that would have taken several weeks." (Pl.'s Mem. Ex. N.) The parties dispute whether Ackerman, Fraser and/or Kemp had any involvement in the issuance of the November 29, 2010 press release.

On November 29, 2010, the Inquirer published an article entitled "Mt. Airy Business at Center of School Spending Controversy." The article reported that Plaintiff sat on the board of a "business incubator" which leased part of its office space to IBS. (Defs.' Mot. Ex. R.)

Following publication of the articles on November 28 and 29, 2010, Plaintiff met with Kemp and Fraser. According to Defendants, during these meetings, Plaintiff stated that he made the decision to award the contract to IBS not Ackerman. (Fraser Dep. 20:17-21:12.) Plaintiff vigorously denies that he made any such statements. (Pl.'s Mem. Ex. B.)

On December 2, 2010, the Inquirer published a third article entitled "Ackerman Acknowledges Directing Surveillance Work to Minority Firm IBS." The article reports that "Nunery said he – not Ackerman – had made the decision two months ago to award the $7.5 million contract to IBS" and that when asked whether the decision was made by the "school district's chief procurement officer" Nunery responded "no." (Pl.'s Mem. Ex. O.)

Following publication of these articles, Michael Davis, General Counsel for the School District, retained an outside law firm to conduct an internal investigation into the alleged improprieties surrounding the camera installation project. (Defs.' Mot. Ex. Y ¶¶ 3-4.)

On December 13, 2010, Defendant Estelle Matthews, Chief Talent and Development Officer[4], informed Plaintiff that he was suspended with pay during the pendency of the investigation. Five other employees, including Dougherty, were also suspended with pay during the investigation. (Pl.'s Mem. Ex. Y.)

On or about December 28, 2010, the Federal Bureau of Investigation ("FBI") informed Plaintiff that they intended to interview him in connection with an investigation into the camera

---

[4] Matthews served a member of Ackerman's executive team and advised Ackerman about employment policies. (Defs.' Mem. Ex. BB, Matthews Dep. 44:14-18; 113:19-23.)

installation project. Plaintiff advised Davis and Matthews of the FBI's request. (Pl.'s Mem. Ex. U.)

On January 13 and 19, 2011, Plaintiff was interviewed by outside counsel. During this meeting, outside counsel informed Plaintiff that the School District had denied Plaintiff's request to be provided with counsel for his upcoming interview with the FBI. (Defs.' Mot. Ex. Y ¶¶ 12-14, 16.)

On January 30, 2011, the Inquirer published an article entitled "Accused of Rigging, District to Redo Bids." That article reported that Plaintiff had actively sought to steer a multi-million dollar management contract to a company known as U.S. Facilities. The allegations were based on a letter written by the attorney for another company, Elliott-Lewis Corp., which had been involved in the competitive bidding process along with U.S. Facilities. (Pl.'s Mem. Ex. T.)

On February 11, 2011, Plaintiff was interviewed by FBI agents. Plaintiff contends that, during this interview, he denied that he selected IBS and was critical of the circumstances surrounding the decision to award the contract to IBS. On February 15, 2011, Plaintiff informed Davis and Matthews that he had met with agents from the FBI. Plaintiff was interviewed by FBI agents for the second time on February 24, 2011. (Pl.'s Mem. Ex. U; Byars Dep. Vol. II. 16:17-18:3.)

On February 16, 2011, outside counsel authored a summary of his findings, concluding that probable cause existed to believe that Plaintiff and Dougherty violated provisions of the School District's Employee Code of Ethics and recommending that disciplinary action be taken. Although outside counsel was tasked with investigating the camera project award process, counsel also found that "[d]ue to the clear overlap in the business purpose of [Plaintiff's website]

and [his] job responsibilities with the School District, [Plaintiff's] outside business interests present an improper conflict of interest." (Defs.' Mot. Ex. Y, Ex. 1 pp. 1, 11-12.)

On February 25, 2011, Matthews informed Plaintiff that the three-day suspension without pay ordered by Nunery in November would be implemented on March 11, March 25 and April 8, 2011. (Pl.'s Mem. Ex. V.)

On March 4, 2011, the School District issued a press release summarizing the findings of outside counsel's investigation. The press release states that outside counsel "found that Procurement Office staff decided to use IBS as the prime contractor" and "failed to have IBS prepare a cost estimate." (Pl.'s Mem. Ex. W.) The parties dispute whether Fraser or Kemp "approved" the information or otherwise participated in the issuance of the March 4, 2011 press release.

On March 24, 2011, Plaintiff received a letter from Matthews advising that the School District was recommending his immediate termination to the SRC for "violation of the District's Code of Ethics, neglect of duty, violation of the school laws of this Commonwealth and other improper conduct." The letter references Plaintiff's website and the Elliot Lewis matter as well as the issues raised in the PIP. (Pl.'s Mem. Ex. X.)

On November 15, 2012, the SRC adopted the School District's recommendation to terminate Plaintiff's employment effective March 24, 2011. Plaintiff appealed the SRC's decision to the Court of Common Pleas, Philadelphia County. On August 8, 2013, the Court of Common Pleas affirmed the SRC's decision.[5] (Defs.' Mot. Ex. Y.)

---

[5] The Court of Common Pleas has jurisdiction to review decisions rendered by the SRC pursuant to 42 Pa. Cons. Stat. Ann. § 933(a)(2).

Plaintiff initiated this action in the Court of Common Pleas, Philadelphia County against the SRC, the School District, Ackerman, Nunery, Matthews, Fraser and Kemp as well as the following individuals who were employed by the SRC during the relevant time period: Robert Archie, Jr., Denise McGregor Armbrister, Joseph Dworetzky and Johnny Irizarry. Plaintiff's initial complaint contained seventeen counts asserting various state and federal causes of action.

Defendants removed the case to federal court and filed a motion to dismiss. Defendants' motion to dismiss was granted in part and denied in part. None of the claims against the individual SRC Defendants, the School District or the SRC survived the motion to dismiss stage. The following claims did survive: Defamation against Defendants Nunery, Fraser and Kemp (November 2010 Statements) (Count I); Invasion of Privacy/False Light Against Defendants Ackerman, Nunery, Fraser and Kemp (November 2010 Statements) (Count II); Defamation against Nunery and Matthews (Suspension) (Count III); Invasion of Privacy against Ackerman (Elliot-Lewis) (Count VI); Defamation against Nunery, Fraser and Kemp (March 4, 2011 Press Release) (Count VII); Invasion of Privacy against Ackerman, Nunery, Fraser and Kemp (March 4, 2011 Press Release) (Count VIII); First Amendment Retaliation against Ackerman, Nunery and Matthews (Count XIII); Aiding and Abetting against Ackerman, Nunery, Matthews, Fraser and Kemp (Count XVI).

On November 11, 2013, Plaintiff filed an amended complaint which included claims against Dougherty.

Defendants Nunery, Matthews, Fraser, Kemp and Ackerman filed the instant motion for summary judgment.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"

that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

### A.  High Public Official Immunity

Defendants argue that Ackerman, Nunery and Matthews are entitled to absolute immunity against Plaintiff's intentional tort claims. At the motion to dismiss stage, I held that Ackerman, as Superintendent, is a high public official and entitled to absolute immunity. As such, I dismissed Plaintiff's defamation claims against Ackerman. Byars v. Sch. Dist. of Philadelphia, 942 F. Supp. 2d 552, 563 (E.D. Pa. 2013).[6] Nonetheless, in briefing, the parties continue to make arguments as to whether Ackerman is entitled to high public official immunity. This issue has already been decided, the time for reconsideration has long passed, and, regardless, there is no basis for revisiting that ruling.

---

[6] Defendants urge that the invasion of privacy claims against Ackerman also fail on high public official immunity grounds. The Pennsylvania Supreme Court has yet to decide whether the doctrine of high public official immunity applies to torts other than defamation. Smith v. Sch. Dist. of Philadelphia, 112 F. Supp. 2d 417, 425 (E.D. Pa. 2000). In Smith, the Honorable Jan E. DuBois "predict[ed] that the Supreme Court of Pennsylvania would hold that the Tort Claims Act does not abrogate high public official's absolute immunity from civil suits for intentional infliction of emotional distress and invasion of privacy." Id. at 426. Judge DuBois reasoned that the doctrine of absolute immunity for high public officials "rests upon the idea that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation." Id. (citing Lindner v. Mollan, 677 A.2d 1194, 1105 (1996).

Like Judge DuBois, I find that extending high public official immunity from defamation to invasion of privacy is consistent with the basic rationale underlying the doctrine. Accord McErlean v. Borough of Darby, 157 F. Supp. 2d 441, 446 (E.D. Pa. 2001). As such, Ackerman is also entitled to high public official immunity on Plaintiff's invasion of privacy claims. (Counts II, VI and VIII).

At the motion to dismiss stage, I did, however, conclude that it was premature to make a ruling regarding high public official immunity with respect to Nunery and Matthews. Defendants now argue that the undisputed evidence shows that Nunery and Matthews are entitled to high public official immunity.

Pennsylvania "exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers." Smith v. Borough of Dunmore, 633 F.3d 176, 181 (3d Cir. 2011) (quoting Lindner v. Mollan, 677 A.2d 1194, 1195 (Pa. 1996) (internal quotation marks omitted)). High public official immunity applies to invasion of privacy claims and false light claims, as well as defamation claims. See Poteat, 33 F. Supp. 2d at 39; McErlean, 157 F. Supp. 2d at 446.

Whether a person is a high public official depends on "the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions." Lindner, 677 A.2d at 1198. However, whether or not the individual serves a policy-making function "is not the sole or overriding factor in determining the scope of immunity. Rather, it is the public interest in seeing that the official not be impeded in the performance of important duties that is pivotal." Durham v. McElynn, 772 A.2d 68, 70 (Pa. 2001). For example, the Pennsylvania Supreme Court concluded that assistant district attorneys are essential to district attorneys in "fulfilling responsibilities of their high public offices . . . carrying out the prosecutorial function" and, therefore, are entitled to high public official immunity. Id.

Likewise, a school superintendent is considered a high public official under this doctrine. Smith, 112 F. Supp. 2d at 425 (citing Petula v. Mellody, 631 A.2d 762 (Pa. Commw. Ct. 1993)). Similarly, school board members, "entrusted with a policymaking role for the School District,

are high public officials." <u>Zugarek v. S. Tioga Sch. Dist.</u>, 214 F. Supp. 2d 468, 479 (M.D. Pa. 2002). Principals and teachers, on the other hand, do not qualify as high public officials. <u>Smith</u>, 112 F. Supp. 2d at 425 n.6.

As I previously noted in the motion to dismiss ruling, Plaintiff's claims are limited to statements made and conduct undertaken in connection with School District business. <u>See</u> <u>Byars</u>, 942 F. Supp. 2d at 563. Thus, if Nunery and Matthews are high public officials, Plaintiff's defamation and invasion of privacy claims against those individuals fail.

Defendants argue that both Nunery and Matthews are high public officials because they were responsible for setting policy for the entire public education system in Philadelphia, served as members of Ackerman's "executive cabinet," held "critically important jobs" and possessed policy making functions. (Defs.' Mot. p. 8.)

Plaintiff responds that "in <u>Dougherty</u>, the Third Circuit denied the same defendants immunity," and, as such, "granting any of the moving Defendants' high public official immunity would be contrary to the public interest and recent precedent on this issue." (Pl.'s Mem. pp. 21-22.) However, the Third Circuit's opinion in <u>Dougherty v. Sch. Dist. of Philadelphia</u>, 772 F.3d 979 (3d Cir. 2014) addressed the question of whether Defendants were entitled to qualified immunity in connection with Dougherty's First Amendment retaliation claim not whether Defendants were high public officials and, therefore, immune to intentional state tort law claims. Therefore, Plaintiff's reliance on <u>Dougherty</u> is misplaced.

After careful review of the record, I find that the undisputed evidence establishes that, at the time of the relevant events, Nunery was a high public official. Nunery's responsibilities included setting policy and "managing the day to day operations of the School District." He was tasked with interfacing with the SRC and, in Ackerman's absence, served as the acting

Superintendent. Nunery was also "required to issue press releases or communications in moments of crises or public accusations." (Defs.' Mot. Ex. 1 ¶¶ 131, 133-35, 137.) All of these duties reflect that Nunery had policy making functions.

Testa v. City of Philadelphia, 2003 WL 22318133, at *3-4 (E.D. Pa. Oct. 8, 2003) supports this conclusion and provides a useful framework for analyzing the scope and nature of Nunery's responsibilities. In Testa, the court concluded that the Chief of Staff to the Mayor of Philadelphia should be granted high public official status. Id. The court noted that the Mayor appointed the Chief of Staff to "implement his initiatives and oversee the operations of City government. She answered directly to the Mayor who delegated her broad authority to speak on his behalf and create specific policies to implement his broad goals." Id. Citing Durham, the court concluded that this was sufficient evidence to "find she was then essential to the Mayor in fulfilling responsibilities of his high public office." Id. at *4.

Like the Mayor's Chief of Staff in Testa, Nunery was tasked with implementing policies for the entire School District and was delegated broad authority to speak on behalf of the School District. Additionally, Nunery was essential to Ackerman's fulfillment of her high public office as Superintendent and was tasked with filling that role in the event of Ackerman's absence. As such, I conclude that the undisputed facts reflect that Nunery was a high public official entitled to immunity from Plaintiff's defamation, invasion of privacy and false light claims (Counts I, II, III, VII, and VIII).

Matthews, on the other hand, did not possess policy-making authority nor was she essential to Ackerman's fulfillment of her own high public office. Rather, the undisputed facts establish that Matthews was "responsible for the hiring, retention, employee relations, benefits, payroll, compensation and discipline practices for all School District employees" and that she

14

advised Ackerman about the School District's policies. (Defs.' Mot. Ex. 1 ¶¶ 129-130). The fact that Matthews had significant responsibility at the School District and advised Ackerman on existing policy is not sufficient evidence to support a finding that Matthews is a high public official. Therefore, Matthews is not entitled to immunity from Plaintiff's defamation, invasion of privacy and false light claims.

### B. Count I – Defamation against Defendants Nunery, Fraser and Kemp (November 2010 Statements)[7]

In Count I, Plaintiff alleges that Defendants Nunery, Fraser and Kemp defamed him in connection with the November 28, 2010 Philadelphia Inquirer article entitled "Ackerman steered work, sources say." [8] More specifically, Plaintiff alleges that Kemp's statement that Ackerman had nothing to do with the decision to award the contract to IBS and that the "procurement officer approved it" are defamatory. Defendants urge that they are entitled to summary judgment because there is no evidence that these statements were made with malice or that anyone other than Kemp was involved in making the statements.

To state a claim for defamation, a plaintiff must show:

> (1) The defamatory character of the communication; (2) Its publication by the defendant; (3) Its application to the plaintiff; (4) The understanding by the recipient of its defamatory meaning; (5) The understanding by the recipient of it as intended to be applied to the plaintiff; (6) Special harm resulting to the plaintiff from its publication; and (7) Abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a).

---

[7] Defendants argue that Plaintiff "has effectively conceded" that Matthews had "no involvement in the November 28, 2010 statement by Kemp" and, therefore, the claim as to Matthews fails. (Defs.' Rep. pp.1-2 n.1.) Count I was not brought against Matthews, (see 2d Amend. Compl. p. 22), and, as such, Defendants' arguments regarding Matthews are moot.

[8] Even though I have determined that Nunery is entitled to high public official immunity, I will nonetheless consider Defendants' additional substantive arguments with respect to the tort claims brought against Nunery.

Regarding the second factor, a defendant may be responsible for publication of a defamatory statement where the "defendant directed or participated in the publication of the defamatory publication by another." Ertel v. Patriot-News Co., 674 A.2d 1038, 1043 (Pa. 1996). "To find that a defendant 'directed' or 'participated in' publication requires, at very least, evidence of some affirmative action on the part of the defendant." Id.

When a public official sues for defamation, the First Amendment demands that the plaintiff prove that the statement was false and that it was made with "actual malice." Tucker v. Fischbein, 237 F.3d 275, 283 (3d Cir. 2001) (citing Hustler Magazine v. Falwell, 485 U.S. 46, 52 (1988)). "Actual malice" requires knowledge that the statement was false or "reckless disregard of whether it was false or not." New York Times, 376 U.S. 254, 279–80 (1964). In order to demonstrate malice, the plaintiff must present "sufficient evidence to permit the conclusion that the defendant entertained serious doubts as to the truth of his publication," St. Amant v. Thompson, 390 U.S. 727, 731 (1968), or acted with a "high degree of awareness of their probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74 (1964). When ruling on a motion for summary judgment, a court must be guided by the "New York Times 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice has been shown with convincing clarity." Anderson, 477 U.S. at 257 (citing New York Times, 376 U.S. at 286).

Defendants first argue that Plaintiff alleges defamation by implication and, therefore, a heightened malice standard applies. Defamation by implication arises when "the defendant juxtaposes [a] series of fact so as to imply a defamatory connection between them, or [otherwise]

creates a defamatory implication." <u>Fanelle v. Lojack Corp.</u>, 2000 WL 1801270, at *3 (E.D. Pa. Dec. 7, 2000). In a defamation by implication case brought by a public figure, a plaintiff must demonstrate "that the defendant either intended to communicate the defamatory meaning or knew of the defamatory meaning and was reckless in regard to it." <u>Kendall v. Daily News Pub. Co.</u>, 716 F.3d 82, 90 (3d Cir. 2013).

Here, even assuming that Kemp's statements are defamatory by implication rather than directly defamatory, I find that Plaintiff has offered sufficient evidence upon which a fact finder could conclude that Defendants were aware of the defamatory meaning of Kemp's statements and acted in reckless disregard to that meaning or intended to communicate that meaning. As detailed above, there is sufficient evidence from which a fact finder could conclude that Defendants knew that Plaintiff did not make the decision to award IBS the contract. Additionally, Defendants were aware that the Philadelphia Inquirer was investigating the alleged improprieties surrounding the contract award. As such, in publicly stating that the procurement officer made a decision that the Inquirer was suggesting was improper, a fact finder could conclude that Defendants acted in reckless disregard to the likelihood that the statements would have a defamatory meaning.

Defendants next urge that they are entitled to judgment because there is no evidence that Kemp's statements in the article were made with malice. Defendants contend that the undisputed evidence shows that Plaintiff was the sole source of Kemp's statements and that Kemp genuinely believed those statements to be true. In support, Defendants cite to Kemp's deposition testimony wherein she states that Plaintiff told her that Ackerman did not select IBS. (Kemp Dep. 14:7-10.) Defendants also cite Fraser's deposition testimony wherein she states that Plaintiff told her that he made the decision to award the contract to IBS. (Fraser Dep. 20:17-21:12.)

Contrary to Defendants' assertion, this evidence does not conclusively establish that Plaintiff was the sole source of Kemp's information. In fact, Defendants do not contend that Plaintiff told Kemp that he made the decision to award IBS the contract and my review of Kemp's deposition testimony confirms that Kemp did not clearly state who made the decision to award the contract. Furthermore, although Fraser testified that Plaintiff stated that he made the decision to award the contract to IBS, she also testified that she could not "really" recall the conversations she had with Plaintiff. (Id. at 13:21-25, 17:17-25.)

Moreover, Plaintiff vigorously disputes that he told Fraser that he made the decision to award IBS the contract and maintains that Ackerman made the decision. (Pl.'s Mem, Ex. A. ¶ 20; Byars Dep. Vol. II 3:20.) Plaintiff also points to Dougherty's deposition testimony wherein he stated that Ackerman directed that the contract be awarded to IBS. (Pl.'s Mem. Ex. H, Francis Dougherty Dep. 171:5-172:10.) Additionally, Kemp testified that she received information about the contract award from Plaintiff, Ackerman, Fraser and Nunery. (Kemp. Dep. 42:25-43:14.) As such, there is adequate evidence to create a genuine issue of material fact as to the source of the statements in the article and whether the statements were made with knowledge of their alleged falsity.

Defendants next argue that, even if the statements were made with malice, the defamation claims against Nunery and Fraser fail because there is no evidence that they acted in concert with Kemp or had any other involvement in the publication of the statements.

In response, Plaintiff cites to a series of emails between Fraser and Ackerman in which they discuss the School District's response to the November 28, 2010 article and subsequent articles as well as emails between Kemp, Nunery, Fraser and Ackerman circulating a draft press release concerning the results of the investigation. (Pl.'s Mem. Exs. BB-DD.) Plaintiff further

notes that Kemp had only been on the job for three weeks as of November 28, 2010 and would not have made the statements on behalf of the School District without direction from her supervisor, Fraser. Viewed in the light most favorable to Plaintiff, this evidence is sufficient to create a genuine issue of material fact as to whether Nunery and Fraser acted in concert with Kemp.

### C. Count II – Invasion of Privacy/False Light Against Defendants Nunery, Fraser and Kemp (November 2010 Statements)

In Count II, Plaintiff alleges that Nunery, Fraser and Kemp "by communicating, directing and/or participating in the communication of statements in November 2010 stating that rather than Ackerman, [Plaintiff] approved of the camera surveillance contract award to IBS gave publicity to a matter concerning [Plaintiff] that placed [Plaintiff] in a false light." (2d Am. Compl. ¶ 100.) Defendants urge that Plaintiff's invasion of privacy claim premised on the November 28, 2010 article fails for the same reasons that Plaintiff's defamation claim premised on the same publication. Namely, Defendants argue that Plaintiff has not demonstrated that the statements were made with knowledge or in reckless disregard of their falsity or that Nunery or Fraser were involved in publication of the statements.

A cause of action for invasion of privacy is "actually comprised of four analytically distinct torts: 1) intrusion upon seclusion, 2) appropriation of name or likeness, 3) publicity given to private life, and 4) publicity placing a person in false light." Krajewski v. Gusoff, 53 A.3d 793, 805 (Pa. Super. Ct. 2012). The last of these, recognized in Pennsylvania as false light invasion of privacy, is defined by the Restatement (Second) of Torts as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in

reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Id. at 805-06 (citing Restatement (Second) of Torts § 652E). Unlike invasion of privacy for publicity given to private life, "false light does not require proof that the matter giving rise to the plaintiff's claim be restricted to one of private concern." Id. at 806.

For the reasons noted above regarding Plaintiff's defamation claim, I find that there is sufficient evidence to create a genuine issue of material fact as to whether Kemp, Nunery and Fraser were involved in the publication of the statements as well whether those statements were made with knowledge of or reckless disregard to their falsity.

### D. Count III – Defamation against Nunery and Matthews (Suspension)

In Count III, Plaintiff alleges that Nunery and Matthews' act of suspending him and escorting him out of the School District building in December 2010 constitutes defamation. (2d Am. Compl. ¶ 107). In his memorandum in opposition to the summary judgment motion, Plaintiff asserts that "Defendants instructed security guards to escort [him] after suspending him, this was humiliating to [him] and gave others the false impression of wrongdoing and impugned [his] reputation." (Pl.'s Mem. p. 14.)

Defendants respond that Plaintiff has not cited to any record evidence to establish that Nunery or Matthews participated in the decision to direct security guards to escort him out of the building. Plaintiff counters that "Defendants instructed security guards to escort" him out of the building but does not cite to any portion of the record in support of this contention. (See Pl.'s Mem. p. 14.)

Notwithstanding Plaintiff's failure to point to facts in the record, my review discloses that there is sufficient evidence on which a fact finder could conclude that Matthews directed the

security guards to escort Plaintiff out of the building. At his deposition, Plaintiff testified that the security officer was sitting directly outside the room when Matthews informed him that he was being suspended and following that interaction he was taken to his office to collect his belongings and was escorted out of the building. (Byars Dep. Vol. II 63:15-66:13.) Based on this testimony, a reasonable fact finder could infer that Matthews, as head of human resources, directed the security guard to wait outside the meeting and escort Plaintiff out of the building.

However, Plaintiff has failed to offer any evidence that Nunery participated in the decision to escort him out of the building or was even present during these events nor does my independent review of the record disclose such evidence. As such, Nunery is entitled to summary judgment on Count III.

Lastly, Defendants argue that Plaintiff cannot establish that his suspension was done with malice. In particular, Defendants contend that the undisputed evidence shows that Plaintiff was suspended in December 2010 because of his inadequate work performance. As noted above, there is a genuine issue of material fact as to Defendants' knowledge of the falsity of the complaints regarding Plaintiff's work performance and involvement in the contract award decision. Accordingly, I find that there is a genuine issue of material fact as to whether the decision to direct security guards to escort Plaintiff out of the building was done with knowledge or reckless disregard to the fact that doing so would convey a the impression that Plaintiff had in fact acted improperly. Therefore, Matthews is not entitled to summary judgment on Count III.

### E. Count VI – Invasion of Privacy against Ackerman (Elliot-Lewis)

In Count VI, Plaintiff alleges Ackerman was involved in making the statements regarding Plaintiff's role in the Elliot-Lewis award that appear in the January 30, 2011 article and that

these statements placed Plaintiff in a false light. As noted above, Ackerman is a high public official and, therefore, is immune to Plaintiff's invasion of privacy claim.

### F. Count VII – Defamation against Nunery, Fraser and Kemp (March 4, 2011 Press Release)

In Count VII, Plaintiff alleges that the March 4, 2011 press release summarizing the findings of the internal investigation was defamatory. (2d Am. Compl. ¶ 135.) The press release in question states that investigative counsel had concluded: (1) the "Procurement Office decided to use IBS as the prime contractor"; (2) "Procurement Office staff improperly delegated the role of managing the project to the Office of School Safety"; and (3) "Procurement Office staff failed to have IBS prepare a cost estimate for the project." (Pl.'s Mem. Ex. W.)

Defendants first argue that the undisputed evidence demonstrates that Nunery, Fraser and Kemp had no involvement in the publication of the March 4, 2011 press release. In support, Defendants contend that Davis was the sole School District employee directing the scope of the investigation and that the press release came directly from the General Counsel's office.

In response, Plaintiff points to an email chain from February 2011 in which a draft of the press release is circulated between Kemp, Fraser, Nunery and Ackerman. (Pl.'s Mem. Ex. DD.) In the email, Fraser informs Ackerman that "[w]e just finished putting his document together" and requests Ackerman's feedback. I conclude that a reasonable inference from the email chain could be that "we" includes Fraser, Kemp and Nunery. Additionally, even though the final press release lists Davis as the contact person, the draft press release lists Kemp as the contact person for press inquiries. Based on this email chain, a reasonable fact finder could conclude that Fraser, Kemp, Ackerman and Nunery all participated in the creation of the press release.

Defendants also argue that Plaintiff cannot show that the statements in the press release were false. In support, Defendants contend that the press release accurately reports the findings of the independent investigation. Plaintiff responds that Defendants knew Ackerman – not Plaintiff – was the person who decided to hire IBS and that they published the findings to the contrary despite knowing they were false.

As noted above, Plaintiff has offered evidence in support of the contention that he did not make the decision to award the contract to IBS and that Nunery, Fraser and Kemp were aware of this fact. Additionally, Pennsylvania has long recognized that an individual who republishes a defamatory statement is subject to liability even though he attributes the statement to the individual who originally uttered it. <u>Medico v. Time, Inc.</u>, 643 F.2d 134, 147 n.4 (3d Cir. 1981) (citing <u>Oles v. Pittsburgh Times</u>, 2 Pa. Super. 130, 142 (1896) ("One who ... repeats a defamatory accusation is deemed to have published it, and is liable to action although he gives the name of the author")); 50 Am. Jur. 2d Libel and Slander § 242 ("[u]nless the republication is privileged, the publisher of a false statement made by another person, when the publisher knows the statement to be false, is not protected by the fact that someone else made the statement. Such person is liable for the publication, even though he is only repeating the defamatory statement of another, and is careful to ascribe the statements to the original speaker"). As such, Defendants Fraser and Kemp are not entitled to summary judgment on Plaintiff's defamation claim premised on the March 4, 2011 press release.

**G. Count VIII – Invasion of Privacy against Nunery, Fraser and Kemp (March 4, 2011 Press Release)**

In Count VIII, Plaintiff alleges that Nunery, Fraser and Kemp "by communicating, directing and/or participating in the publication of the March 4, 2011 press release gave publicity

to a matter concerning [Plaintiff] that placed [Plaintiff] before the public in a false light." (2d Am. Compl. ¶ 142.)

Defendants urge that Plaintiff's invasion of privacy claim premised on the press release fails for the same reasons that Plaintiff's defamation claim premised on the same publication fails. Namely, Defendants argue that Plaintiff cannot show that Nunery, Fraser and Kemp authored the press release or that its contents were false. For the reasons noted above in the context of Plaintiff's defamation claim, I find that there is sufficient evidence to create a genuine issue of material fact as to Plaintiff's invasion of privacy claim premised on the March 4, 2011 press release.

## H. Count XIII – First Amendment Retaliation against Ackerman, Nunery and Matthews (in their individual capacities)

In Count XIII, Plaintiff alleges that the actions Ackerman, Nunery and Matthews took with respect to his employment and ultimate termination were in retaliation for the exercise of his "First Amendment right to speak out about matter of public concern to the FBI." (2d Am. Compl. ¶¶ 174-75.) Defendants argue that Plaintiff's First Amendment retaliation claim fails as a matter of law for two main reasons. First, Defendants argue that Ackerman, Nunery and Matthews are immune under the doctrine of qualified immunity. Second, Defendants argue that Plaintiff cannot establish that Ackerman, Nunery or Matthews were aware of the content of Plaintiff's speech during his meetings with the FBI or that his speech was a motivating factor in his termination.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009)

(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). The qualified immunity analysis has two-prongs and the court has discretion as to which prong to address first. <u>Pearson</u>, 555 U.S. at 236. Under the first prong, a court must "decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." <u>Pearson</u>, 555 U.S. at 232 (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 212 (2001)). Under the second prong, the court must decide "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." <u>Id.</u>

### a. Whether Plaintiff Established a Constitutional Violation

Under the first prong, I must determine whether the facts establish a constitutional violation. To establish a First Amendment retaliation claim, a public employee must show "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." <u>Lauren W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007). If a plaintiff satisfies these elements, the burden then shifts to the defendant to demonstrate that the same action would have been taken even if the speech had not occurred. <u>Id.</u>

### i. Protected Activity

Regarding the first element, a plaintiff's speech is entitled to First Amendment protection where: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006)).

Regarding the first factor, when public employees "make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. This rule reflects an employer's prerogative to control "what the employer itself has commissioned or created." Id. at 411. Further, the inquiry into whether particular speech is made pursuant to official duties is a "practical one." Id. at 422. A plaintiff's "speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." Gorum, 561 F.3d at 185 (3d Cir. 2009) (quoting Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007), overruled on other grounds by Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2491 (2011)). The Third Circuit has consistently held that "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties." Morris v. Phila. Housing Auth., 487 Fed. Appx. 37, 39 (3d Cir. 2012).

At the motion to dismiss stage, I found that the complaint sufficiently alleged that Plaintiff was speaking as a private citizen and not pursuant to his official duties when he met with the FBI. I noted that:

> There is no indication from the complaint that Plaintiff had an official duty to participate in the FBI's investigation, or that Defendants commissioned Plaintiff's statements. Although Plaintiff's speech likely relates to special knowledge or experience acquired through his job, this is but one consideration in determining whether speech is within an employee's official duties. See Gorum, 561 F.3d at 185. Moreover, this is not a case in which the speech at issue was communicated internally up the chain of command.

Byars, 942 F. Supp. 2d at 571.

These conclusions are supported by facts in the record which establish that Plaintiff willingly met with the FBI and that Defendants had no presence at the interviews or involvement

in what Plaintiff said to the FBI. There is no evidence that Plaintiff had an official duty to participate in the FBI investigation or that Plaintiff reported his concerns up the chain of command. As such, a reasonable fact finder could conclude that Plaintiff was speaking as a citizen rather than as an employee when he met with the FBI.

Regarding the second factor, a public employee's speech involves a matter of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993). In making this determination, courts must look to "the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48, (1983). Speech involves a matter of public concern if it attempts "to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) (citing Holder, 987 F.2d at 195).

Plaintiff asserts that during the interview with the FBI he denied selecting IBS for the contract and that he was critical of the School District regarding the circumstances of that award. As I previously determined, the fact that Plaintiff's statements may have been motivated in part by his personal interests is not per se fatal to his claim. See Byars, 942 F. Supp. 2d at 571. That said, a fact finder could certainly conclude that Plaintiff's statements regarding the alleged misuse of public funds involve a matter of public concern.

Regarding the third factor, Pickering v. Board of Education, 391 U.S. 563 (1968) sets forth the test for determining whether the government employer had "an adequate justification for treating the employee differently from any other member of the general public" as a result of his protected speech. Garcetti v. Ceballos, 547 U.S. 410, 410 (2006). Under Pickering, courts balance the interest of the employee, as a citizen, in "commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. "The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer." Dougherty, 772 F.3d at 991.

With regard to Plaintiff's interest, I must consider the interest of Plaintiff as well as the public in the speech at issue. See O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3d Cir. 1989) ("With regard to the employee's interest, we must also take into account the public's interest"). With regard to the School District's interests, the Third Circuit instructs that I should consider "whether the [expression] impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Baldassare, 250 F.3d at 198 (citing Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

The Third Circuit recently considered whether the moving Defendants were entitled to qualified immunity in connection with a First Amendment retaliation claim brought by Dougherty wherein he alleged that he was terminated for providing information regarding the IBS contract award to the Philadelphia Inquirer. Dougherty, 772 F.3d at 982. Although Defendants accurately note that the qualified immunity analysis is case specific, the Third Circuit's ruling in Dougherty provides useful guidance for applying the foregoing Pickering framework to Plaintiff's claim.

Regarding Dougherty's interest, the Third Circuit concluded that "Dougherty's report to The Philadelphia Inquirer exposing Ackerman's alleged misconduct is the archetype of speech deserving the highest rung of First Amendment protection," and, as such, Defendants bore "a

truly heavy burden" of demonstrating that the government's interests outweigh Dougherty's interests. Id. at 991.

Regarding the School District's interest, the Third Circuit agreed with the district court's conclusion that "while Dougherty was relatively high up in the chain of command as Deputy Chief Business Officer for Operations and Acting Chief of Operations, Dougherty's relationship with Ackerman and Nunery was neither close, personal nor confidential, and that Dougherty never served as an 'alter ego' for either." Id. at 991-92. The Third Circuit also agreed that a reasonable fact finder could conclude that Dougherty's speech would have made only a minimal disruption had the School District not launched an investigation, suspended employees and subsequently fired Dougherty. Id. at 992. As such, the Third Circuit affirmed the district court's ruling that any disruption to the School District was outweighed by the substantial public interest and that Dougherty had established a constitutional violation. Id.

The undisputed facts before me support similar conclusions regarding Plaintiff's First Amendment retaliation claim. Plaintiff has a strong interest in the type of speech at issue which involves a matter of public concern. In fact, speech "involving government impropriety occupies the highest rung of First Amendment protection." Swineford v. Snyder County, 15 F.3d 1258, 1274 (3d Cir. 1994). Furthermore, "[t]he public has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of these public officials." O'Donnell, 875 F.2d at 1062. Therefore, Defendants bear a heavy burden of demonstrating that their interests in workplace efficiency outweigh Plaintiff's interest.

Regarding the School District's interest, like Dougherty, Plaintiff was relatively high up in the chain of command as the head of the procurement office. However, his relationship with

Ackerman and Nunery was neither personal nor confidential and he did not serve as an alter ego for either individual. Furthermore, a reasonable fact finder could conclude that Plaintiff's speech would not have caused much disruption if the School District had not launched an investigation and subsequently terminated Plaintiff's employment. As a result, a fact finder could conclude the School District's interest in maintaining workplace harmony and the regular operation of its affairs was not seriously threatened by Plaintiff's speech. Therefore, I conclude that there is the sufficient evidence for a fact finder to decide, under <u>Pickering</u>, whether the School District had an adequate justification for treating Plaintiff differently from any other member of the public.

Having concluded that Plaintiff has sufficiently established that his speech was protected by the First Amendment, I must next consider whether Plaintiff has offered sufficient evidence to establish that Defendants took an adverse employment action against him.

### ii. Adverse Employment Action

Defendants dispute Plaintiff's ability to demonstrate that the actions taken against him amount to an adverse employment action. Plaintiff counters that Defendants' act of recommending his termination to the SRC constitutes an adverse employment action. I agree with Plaintiff that there are sufficient facts for a fact finder to decide this issue.

In the First Amendment retaliation context, "the key question . . . is whether the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." <u>Suppan v. Dadonna</u>, 203 F.3d 228, 234–35 (3d Cir. 2000) (citing <u>McKee v. Hart</u>, 436 F.3d 165, 169 (3d Cir. 2006). Retaliatory acts must be "more than de minimis or trivial" to have an adverse effect on a plaintiff's First Amendment rights. <u>Brennan v. Norton</u>, 350 F.3d 399, 419 (3d Cir. 2003) (quoting <u>Suarez Corp. Industries v. McGraw</u>, 202 F.3d 676, 686 (4th Cir. 2000)). Decisions relating to "promotion, transfer, recall and hiring" are significant

enough to qualify as retaliatory, while "criticism, false accusations, or verbal reprimands" are not. Brennan, 350 F.3d at 419.

Although the SRC was the body that actually effectuated Plaintiff's termination, the School District administrators' recommendation that Plaintiff be terminated is surely not trivial or de minimis. I find that a reasonable fact finder could conclude that a person of ordinary firmness would be deterred from exercising his First Amendment rights by such a recommendation. As such, Plaintiff has offered sufficient evidence upon which a reasonable fact finder could conclude that the recommendation to the SRC that Plaintiff be terminated is an actionable adverse employment action.[9]

### iii. Substantial Factor

Defendants next argue that Plaintiff cannot establish the necessary causal connection between his speech and his termination. A plaintiff must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action. Baldassare, 250 F.3d at 195. If the plaintiff carries this burden, the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." Suppan, 203 F.3d at 235.

Defendants argue that Plaintiff has not established a causal connection between his speech and his termination because he failed to offer any evidence demonstrating that Ackerman, Nunery or Matthews knew that Plaintiff met with the FBI, let alone that they were aware of the

---

[9] Defendants also contend that there is no evidence that Matthews personally participated in the decision to recommend Plaintiff's termination. Plaintiff counters that Matthews signed the letter notifying him that the School District was recommending his termination and explaining the basis for that recommendation. (Defs.' Mot. Ex. CC.) Additionally, Matthews was tasked with advising Ackerman on matters involving termination of employees. I find that these facts create a genuine issue of material fact as to Matthews' personal involvement in the decision to recommend Plaintiff's termination.

content of those discussions. In response, Plaintiff points to an email in which he informed Davis and Matthews that he met with the FBI to discuss the contract award on February 24, 2011. (Pl.'s Mem. Ex. U.) Additionally, as noted above, there is sufficient evidence in the record to support Plaintiff's contention that he denied making the decision to award IBS the contract. Plaintiff's assertion that he did not make the decision in question directly contradicted the School District's initial statements to the press. Taken together and viewed in the light most favorable to Plaintiff, these facts could lead a reasonable fact finder to conclude that Defendants were aware that Plaintiff met with the FBI to discuss the camera project and, that during these meetings, he maintained his position that he did not make the decision to award the contract to IBS.

Defendants next argue that Plaintiff cannot establish the necessary causal connection because the evidence shows that he was terminated because of his poor work performance and the operation of his website violated the School District's code of conduct. In support, Defendants urge that the decision to terminate Plaintiff was based upon the independent investigation's finding that Plaintiff had violated School District policy by operating his personal website and interfering with the Elliot-Lewis bid. (Defs.' Mot. Exs. Y, CC.)

Plaintiff responds that there is sufficient evidence on which a fact finder could conclude that the reasons given in the report and termination letter were pretextual. In support, Plaintiff points to the following facts: 1) from 2003 to 2010 he only received positive evaluations and promotions; 2) he discussed his website with Solomon prior to launching it and Solomon never indicated that it was improper; 3) the School District implemented the unpaid suspension ordered in November by Nunery within days of Plaintiff's first meeting with the FBI; and 4) Defendants notified Plaintiff of his termination within weeks of his meeting with the FBI.

Viewing these facts in the light most favorable to Plaintiff, I conclude that there is sufficient evidence upon which a reasonable fact finder could conclude that Plaintiff's report to the FBI was a motivating factor in his termination. As such, the disputed issues surrounding the reasons for Plaintiff's termination require resolution by a trier of fact. See Dougherty v. Sch. Dist. of Philadelphia, 2013 WL 5525642, at *14 ("insofar as Defendants argue the recommendation to terminate was based on [the recommendation of outside counsel] and was in no way connected to Dougherty's reports to the press, this is more properly viewed as a challenge to the factual issue of motivation").

### b. Whether the Constitutional Right Was Clearly Established

Having found that Plaintiff has offered sufficient evidence that his constitutional rights were violated, the second prong requires that I analyze whether those rights were clearly established. Clearly established rights "are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001). In other words, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." Id. at 572.

Defendants argue that no precedent establishes that it violates the First Amendment to recommend termination of an employee when an independent investigator finds probable cause to believe that the employee violated School District policy. However, as noted above, there is a genuine issue of material fact as to the motivation for Plaintiff's termination and, for summary judgment purposes, I must view the evidence in the light most favorable to Plaintiff.

Viewed in that light, the facts of record could support a conclusion that Plaintiff's speech, made as a citizen, sought to expose governmental corruption. "Since at least 1967, it has been

settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Dougherty, 772 F.3d at 993 (quoting Connick v. Myers, 461 U.S. 138, 142 (1983)). As such, Plaintiff's speech fits squarely within case law establishing a public employee's right to speak out on matters of public concern. See, e.g., Bennis v. Gable, 823 F.2d 723, 733 (3d Cir. 1987) ("as of 1982 the law was 'clearly established' that a public employee could not be demoted in retaliation for exercising his rights under the first amendment"). Thus, Defendants were on notice that their actions purportedly taken in response to Plaintiff's protected speech would not be shielded by qualified immunity.

## I. Count XVI Aiding and Abetting against Ackerman, Nunery, Matthews, Fraser and Kemp

In Count XVI, Plaintiff alleges that Ackerman, Nunery, Matthews, Fraser and Kemp "engaged in [ ] tortious conduct in concert with each other in that all defendants acted in accordance with an agreement to cooperate in a particular line of conduct and/or to accomplish a particular result." (2d Am. Compl. ¶ 200.)

Establishing a claim for aiding and abetting or "concerted action" requires that the defendant 1) commits a tortious act in concert with another or pursuant to a common design; 2) "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself;" or 3) "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Burnside v. Abbott Laboratories, 505 A.2d 973, 982 (Pa. Super. 1985) (citing Restatement (Second) of Torts § 876.)

Defendants argue that Plaintiff's aiding and abetting claim fails because Plaintiff has not established any underlying tortious conduct. As noted above, Ackerman and Nunery are entitled

to high public official immunity and the invasion of privacy and defamation claims against them fail on those grounds. As there are no viable tort claims against Ackerman and Nunery, the aiding and abetting claims against them fail as well.

However, there is a genuine issue of material fact as to several of the tort claims filed against Matthews, Kemp and Fraser. Nonetheless, Defendants argue that there is no evidence that Kemp and Matthews aided and abetted each other or any other person. In support, Defendants assert that the evidence shows that Kemp and Fraser were not employed by the School District until November 8, 2010 and did not participate in the decision to award IBS the contract.

However, Fraser and Kemp were employed by the School District at the time that the first allegedly defamatory statements were published. Additionally, there is sufficient evidence in the record to establish that Fraser and Kemp discussed the School District's response to the media coverage and coordinated their efforts with others. This evidence, viewed in the light most favorable to Plaintiff, would permit a reasonable fact finder to conclude that Fraser and Kemp published the allegedly actionable statements pursuant to a common design to defame or place Plaintiff in a false light.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order follows.